UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 18 CR 758-1 |
| v. | Judge John J. Tharp, Jr. |
| PIERRE ROBINSON | Emergency Judge Gary Feinerman |

**Government's Response To Defendant's Motion For Pretrial Release**

Defendant Pierre Robinson has filed an emergency motion for pretrial release (R. 70). Given the extraordinarily serious charge defendant faces, and the extraordinary danger to the community he poses, there are no conditions that can reasonably ensure defendant's appearance and the safety of the community. Consequently, for the reasons discussed below, defendant's motion should be denied.

I. BACKGROUND

A. The Instant Offense

On December 23, 2014, defendant shot and killed Glenn Houston inside of a convenience store on the South Side of Chicago. Defendant was on parole when he murdered Houston.

As alleged in the indictment, the murder of Houston was a premeditate revenge killing. Defendant is a member of the Evans Mob faction of the Gangster Disciples street gang, which was in an ongoing conflict with the "MTV" faction of the Black Disciples. Houston was affiliated with the MTV Black Disciples. Robinson held the rival MTVs responsible for the killing of one of Robinson's fellow gang members and killed Houston, despite the fact that there was no indication that Houston was personally involved in the killing.

The murder was captured on the store's surveillance video. People who know Robinson well recognized him in the video.





Not only was Robinson on parole at the time of the murder, but he had been arrested just six days earlier. At the time of the arrest, Robinson was wearing the same clothing he wore during the murder:

3



Approximately 30 minutes before the murder, defendant posted a memorial to Chris Spraggins, a/k/a "Chris G," a member of the Evans Mob who had been killed (December 23 would have been Spraggin's birthday). Among other things, Robinson wrote, "I Used To Ask U Do U Got Me If I Got Taken Out This Shit Early," and "We Got Each Other." A little less than an hour of the murder, Robinson posted, "Mann Wassup Its Chris G Day Pop Out." The following day, Robinson bragged about being "BACK AT IT." Then, on December 25, Robinson posted (explanation in brackets):

> LOOK MAN
> I GOT A RUGGER [Ruger – other photos show Robinson with a Ruger
> P95 handgun with an extended magazine] ON ME NOW

> I GOT LIKE FOUR BABY CHOPPERS [Tec 9s or guns with extended magazines]
> KNOW WHAT I MEAN???
> I FEEL LIKE OSAMA IN THIS MOTHERFUCKER
> BIN LADEN THAT IS
> #WARREADY



In private postings, Robinson also defaced photographs of Houston, apparently taking credit for his killing. For example, Robinson posted a photograph of Houston with the words "Mac in my Blunt" handwritten on it. According to gang experts from the Chicago Police Department, this is a reference to killing Houston. Similarly, Robinson posted images of Houston with "BDK, "MTVK," and "I'm dead" handwritten on it. "BDK" is common slang for "Black Disciple Killer," a phrase used by rivals of the Black Disciples.

5

### B. June 18, 2015, shooting of Deshawn Danzler and murder of Hamood Dawoodi

Robinson's parole was revoked following the murder of Glenn Houston. He was released from prison in May 2015.

On June 18, 2015, Robinson's fellow Evans Mob member Lynell Simmons, a/k/a "Gutta," was shot and killed. The shooting took place at about 3:10 p.m. Two men got out of a maroon van and started firing. Simmons was pronounced dead at the hospital about 30 minutes later.

Substantial evidence indicates that later that evening, shortly before 9:55 p.m., Robinson traveled to the apartment building where Deshawn Danzler lived, located at 7945 South State Street. Danzler is an MTV member.

Robinson buzzed several apartments until Hamood Dawoodi, who lived in the first floor apartment, answered the door. Moments later, Dawoodi knocked on the door to Danzler's apartment, which was the basement unit. Danzler opened the door partially and saw Dawoodi. Robinson then jumped out of the stairwell and began shooting Danzler, who slammed the door shut. Robinson continued to shoot through the door. There was then a pause in the shooting, after which Robinson shot Dawoodi several times. He then fled the scene. Danzler survived with a deep graze wound to his scalp and a broken wrist, but Dawoodi died from his wounds.

Danzler was transported to the hospital. Danzler was interviewed by Chicago Police Detectives there. He gave an account of what happened that is consistent with the facts described above, except that he claimed he did not see the shooter. The next day, July 19, he received a telephone call from Robinson. During the call, Robinson

6

taunted Danzler. He told Danzler he was "fast" unlike the "other guys." Robinson also posted several Facebook memorials to Simmons on June 19.

The evening of June 19, after he was discharged from the hospital, Danzler called his brother Marcus Rollins in jail. The calls were recorded. During those calls, Danzler described in detail the events of June 18, and identified the shooter as Pierre Robinson.[1] Rollins confirmed that he knew who Robinson was, and described him as the person who killed "G-Mac" (Glenn Houston) in the convenience store in December. During this and subsequent recorded jail calls, Danzler also discussed the shooting of Gutta, and identified the MTV members responsible.

### C. Federal Gun Case

Robinson was prosecuted federally for being a felon in possession of a firearm in case number 16 CR 782. Police officers responded to a call of a man flashing a gun near the intersection of 63rd and Eberhardt in Chicago. They responded, and encountered Robinson in possession of a semiautomatic pistol.

At sentencing, the government presented detailed evidence regarding Robinson's use of social media. 16 CR 782, R. 70. That evidence included Robinson frequently posing with firearms, bragging about his involvement with the Evans Mob, and taunting rival gang members. *Id.*

### D. Procedural Background

Defendant was charged by indictment on November 7, 2018, with one violation of 18 U.S.C. § 1959(a)(1), murder in order to maintain or increase Robinson's position

---

[1] Danzler refuses to testify about the incident. He is currently being prosecuted for contempt of court in case number 19 CR 518.

7

in the Evans Mobb street gang. Defendant, who was serving his federal sentence in case number 16 CR 782, had his initial appearance in this matter on November 30, 2018, and has been held in federal custody since. R. 7. On April 24, 2019, a superseding indictment was returned, which added an 18 U.S.C. § 1591(a)(1) charge against co-defendant Derrick Swanson, for a different murder. This is defendant's first motion for bond in this case.

## LEGAL STANDARD

Because defendant has been charged with a crime of violence, this Court must detain defendant if the government shows, by a preponderance of the evidence, that no conditions will reasonably assure defendant's presence in court and/or, by clear and convincing evidence, that no conditions will reasonably assure the safety of any other person and the community. 18 U.S.C § 3142(f)(1).

In evaluating whether defendant should be detained, a court must take into account (1) the nature and circumstances of the offenses charged; (2) the weight of the evidence; (3) the defendant's history and characteristics, including his "physical and mental condition;" and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g).

**II. ARGUMENT**

Defendant has failed to rebut the presumption in favor of detention in this case. Defendant poses an extreme danger to the community. The last two times he was released from prison, he murdered someone.

Defendant faces, at minimum, life imprisonment without the possibility of parole. His incentive to flee could not be greater.

There is no condition or set of conditions that can reasonably assure defendant's appearance in court or the safety of the community. Moreover, as detailed below, the MCC has implemented a comprehensive set of protocols to control the spread of COVID-19 within the facility. In light of the extensive measures being taken to contain and treat COVID-19, and given the medical resources to which defendant has access at MCC, the Court should deny defendant's motion for release on grounds that defendant's continued detention is necessary to reasonably assure his appearance in court and public safety.

### A. The Section 3142(g) Factors Weigh Heavily in Favor of Detention

#### 1. The Nature and Circumstances of the Offenses and the Weight of the Evidence

Defendant committed a premeditated murder of a rival gang member. Afterward, he bragged about it online.

The weight of the evidence against defendant is strong. The murder was captured on videotape. He was wearing the same clothes he wore when arrested just six days earlier. Multiple people who know defendant well are prepared to testify that they recognize him in the video. An eyewitness inside the store has also identified defendant. Finally, defendant posted online about his motive and celebrated the murder of Houston.

The nature and circumstances of the offense and the weight of the evidence weigh heavily in favor of detention.

9

### 2. Defendant's History and Characteristics

Defendant has an uninterrupted string of arrests and convictions for gun and gang related crimes. Most of his crimes were committed while under some form of court supervision. While two of defendant's unlawful use of a weapon convictions were vacated after the state supreme court invalidated part of the Illinois unlawful use of a weapon statute, the underlying conduct remains the same: he was a member of a violent street gang who carried guns.

### B. Officials Have Established Comprehensive Health Measures at the MCC

Defendant is a healthy 26-year-old man. Per the Court's order, the government obtained and filed defendant's medical records from MCC under seal. R. 73. Defendant does not claim that he has tested positive for COVID-19 or that he is exhibiting any symptoms related to COVID-19. R. 70.

In his motion, defendant claims that he suffers from "syncope disorder," which makes him "more vulnerable and at higher risk of getting sick from the virus." R. 70, pp. 3-4. This condition does not appear on the CDC's list of factors placing individuals at higher risk from COVID-19.[2] Defendant has not offered any evidence to support his claim that this condition puts him at increased risk for complications from COVID-19, let alone his claim that it increases his risk of contracting the virus.

Nor does "syncope disorder" or references to losing consciousness appear in defendant's medical records from the BOP. In his presentence report from his prior

---

[2] Available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited May 20, 2020).

case, defendant reported that, "When he was approximately 14 years old, he experienced four to five episodes in which he lost consciousness. The defendant was treated at the University of Chicago Hospitals and was informed that he had legions on his lungs." According to the PSR, the probation officer did not receive a response to the officer's request for medical records from the hospital. Defendant has not presented enough evidence to conclude that he suffers from a medical condition that places him at increased risk of complications from COVID-19.

In addition, while it is true as a general matter that prisons can be trouble spots for the transmission of viruses, the MCC has established a comprehensive set of precautionary measures to limit transmission inside the jail. Based on the most recent information from MCC administrators, as of May 19, 2020, a total of 30 staff members and 139 inmates have tested positive for COVID-19. Of the 30 staff members, 20 have returned to work after receiving medical clearance to do so. The remaining staff members either have not been at the MCC for the last several weeks or have had limited recent interaction with inmates as a result of the restrictions and modifications now in effect at the MCC—that is, inmates are mostly confined to their cells and will continue to be so for the near future. With respect to inmates, none are hospitalized, and 123 have been medically cleared and were returned to general population, consistent with the Federal Bureau of Prisons (BOP) COVID-19 Action Plan.

Despite the positive cases at the MCC, it remains a safe place for defendant to be housed. Consistent with the Federal Bureau of Prisons COVID-19 Action Plan, the

MCC has taken extraordinary steps to combat this virus and remains committed to providing all necessary precautionary measures and supportive therapies to avoid an outbreak of COVID-19, including taking all of the preventive actions advised by the Centers for Disease Control and Prevention (CDC) and the Illinois Department of Public Health regarding the disease.

MCC officials have substantial experience ensuring that viral outbreaks do not occur at their facilities. They recognize the unique threat posed by the transmission of viruses inside a jail. That said, health and prison officials recognize that COVID-19 carries an increased risk of transmission, carries a higher fatality rate than many other viruses, and has resulted in a state of emergency nationwide. Accordingly, consistent with Phase Two of the Bureau of Prisons COVID-19 Action Plan implemented on March 13, 2020,[3] the MCC has employed the following measures:

- **Social Visitation**. The MCC has placed a temporary hold on all social visits, such as visits from friends and family, as well as all outside programming, to limit the number of people entering the MCC and interacting with detainees. Attorney visits are occurring on a case-by-case basis when approved by the warden.

- **Detainees Entering the Facility**. As of March 13, 2020, the MCC and BOP suspended inmate movement between facilities for 30 days (and have since reevaluated and extended that policy, as explained below). The MCC will make exceptions for special cases such as writs for prosecution on pending charges, Interstate Agreements on Detainers, medical or mental health reasons, RRC placements, and judicial proceedings (which are evaluated on a case-by-case basis). The MCC will also continue to process and admit new inmates, who are being screened for COVID-19 exposure risk factors and symptoms, including having their temperature taken.

- **Screening Procedures**. When a new detainee enters the MCC,

---

[3] https://www.bop.gov/resources/news/20200313_covid-19.jsp (last visited May 14, 2020).

12

> medical professionals will screen the inmate for coronavirus symptoms and exposure risk factors, including having the inmate's temperature taken.

- **Sanitation and Hygiene**. Signs and hand sanitizer have been posted throughout the MCC, educating detainees and correctional officers about proper hygiene. In addition, the MCC is increasing daily cleaning of surfaces.

- **Quarantine**. Asymptomatic inmates with exposure risk factors are being quarantined. Symptomatic inmates with exposure risk factors are being isolated and tested for COVID-19 per local health authority protocols.

- **Correctional Officers**. Enhanced health screening of MCC staff will be implemented in areas with "sustained community transmission," as determined by the CDC. Such screening includes self-reporting and temperature checks (initially for the 30 days following March 13 and subsequently extended as part of the BOP's later phases).

Since late March 2020, the BOP has announced the immediate implementation of additional phases of its COVID-19 Action Plan. The BOP updated its quarantine and isolation procedures to require all newly admitted inmates to BOP, whether in a sustained community transition area or not, be assessed using a screening tool and temperature check, and to require asymptomatic inmates be placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation.

On April 1, 2020, the BOP announced the immediate implementation of Phase 5 of its COVID-19 Action Plan, which includes the following measures:[4]

- For an initial 14-day period (which has subsequently been extended),

---

[4] *See* https://www.bop.gov/resources/news/20200331_covid19_action_plan_7.jsp (last visited May 20, 2020).

13

- inmates in every institution will be secured in their assigned cells/quarters to decrease the spread of the virus. This modification to our action plan is based on health concerns, not disruptive inmate behavior.

- During this time, to the extent practicable, inmates should still have access to programs and services that are offered under normal operating procedures, such as mental health treatment and education.

- In addition, the Bureau is coordinating with the United States Marshals Service to significantly decrease incoming movement during this time.

- After 14 days, this decision will be reevaluated and a decision made as to whether or not to return to modified operations.

- Limited group gathering will be afforded to the extent practical to facilitate commissary, laundry, showers, telephone, and Trust Fund Limited Inmate Computer System access.

- As of April 10, 2020, all staff members and inmates at the MCC are wearing face masks for further protection.

Phase Five was extended with Phase Six, which extended the previously-adopted limitations on inmate movement, the suspension of social and legal visits, and the requirement of a 14-day quarantine for all new intakes, detainees, writ returns, parole violators, and hospital returns (even if asymptomatic), in addition to any close contacts of a confirmed or suspected case of COVID-19.[5] Phase Six also provides that any inmate with COVID-19 symptoms or a fever shall be isolated in a single cell with specific test-based and symptom-based strategies for release from isolation; that all staff and contractors must wear personal protective equipment; and that all staff and inmates should wear face coverings. And most recently, as of May

---

[5] *See* https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_plan_6.pdf (last visited May 14, 2020); https://prisonology.com/wp-content/uploads/2020/04/COVID-19-Phase-6-Plan-2020-04-13.pdf (last visited May 14, 2020).

18, 2020, the BOP implemented Phase Seven of its Action Plan, which extends Phase 6 through June 30, 2020. As a result of these provisions, in addition to inmates who have displayed symptoms of COVID-19 or who have tested positive for COVID-19 being placed in isolation, the units in which these inmates were housed have been quarantined.

In short, by following the BOP's COVID-19 Action Plan, the MCC has implemented comprehensive measures to protect its detainees and staff from COVID-19. Given these comprehensive measures, defendant's pretrial release is unwarranted. *See, e.g., United States v. Ayala-Calderon*, 2020 WL 1812587, at *3 (E.D. Tex. Apr. 8, 2020) (denying release because "[d]efendant has not presented any countervailing argument or evidence that adequate precautions are not being taken in the Bowie County Correctional Center"); *United States v. Neadeau*, 2020 WL 1694853, at *3 (D. Minn. Apr. 7, 2020) ("[T]he Court cannot conclude that release is appropriate when the Sherburne County Jail has taken appropriate measures to prevent an outbreak."); *cf. United States v. Wesson*, 2020 WL 1814153, at *2 (N.D. Ohio Apr. 9, 2020) (denying post-conviction release under § 3145(c) because the "U.S. Marshals Service has taken extraordinary measures to limit the threat posed by COVID-19," meaning that "speculation about future conditions does not constitute a 'compelling reason' for temporary release.").

In addition to implementing the various phases of this Action Plan, the MCC also has doctors and nurses who monitor and provide care onsite to detainees like defendant. They continue to make regular rounds should defendant decide to seek

15

medical assistance for whatever reason. If defendant should need intensive treatment that cannot be provided inside the MCC, detainees are transported to community hospitals in the event of an emergency. And in the event that defendant becomes infected with COVID-19, he would be quarantined, monitored, and receive any needed treatment, consistent with the Center for Disease Control's guidelines. This too militates against his release. *See, e.g.*, *United States v. Molina*, 2020 WL 1640182, at *1 (N.D. Ala. Apr. 2, 2020) (denying post-conviction release under § 3145(c) in part because defendant's jail "has 24-hour medical staff available").

In short, defendant is housed in a detention facility where social contact with the outside world has been suspended, where new entrants (staff and inmates) to the facility are screened, and where measures to isolate high-risk individuals are in progress, and at which his exposure to COVID-19 is limited. Thus, there is nothing exceptional about the COVID-19 pandemic that warrants defendant's immediate release from the MCC.

## C. Releasing Defendant and Others Like Him Would Place An Undue Burden on the Pretrial Services Office and the Courts

Releasing defendant and others like him would place a substantial and unwarranted burden on Pretrial Services and the Courts. For example, to place a defendant on release, a Pretrial Services Officer must vet the proposed residence and meet the proposed third-party custodian and other residents who live there. A flood of release orders would force these Officers to conduct a substantial amount of *in-person*, *in-home* meetings, exposing them to a heightened risk of infection. To be sure, one case, by itself, would not strain the system. Yet if the Court released defendant,

16

there undoubtedly would be an avalanche of defendants would also seek release, endangering the community and also stretching the bandwidth of Pretrial Services. COVID-19 does not diminish the public interest in ensuring defendant appear in court and the safety of the community. In light of the protective measures now in place at the MCC and the § 3142(g) factors outlined above, COVID-19 does not warrant defendant's release from jail.

## CONCLUSION

For the foregoing reasons, the Court should deny defendant's motion and order his continued detention pending trial.

                                      Respectfully submitted,
                                      JOHN R. LAUSCH, JR.
                                      United States Attorney

By:   */s/ Rajnath P. Laud*
       RAJNATH LAUD
       Assistant U.S. Attorney
       219 South Dearborn St., Rm. 500
       Chicago, Illinois 60604
       (312) 469-6306

Dated: May 20, 2020